***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a pretrial agreement as:
 STIPULATIONS
1. Plaintiff's alleged date of injury is 17 July 1995.
2. On that date, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act. All parties are properly before the Industrial Commission, and the Commission has jurisdiction over this action.
3. On that date, an employment relationship existed between plaintiff and defendant.
4. Key Risk Management Services, Inc. is the servicing agent for the self-insured employer in this case.
5. All parties have been correctly designated, and there is no question as to misjoinder or non-joinder of parties.
6. Plaintiff's average weekly wage is $472.40, and his compensation rate is $314.95, subject to verification. The parties stipulated to these figures in approved Forms 21 and 26.
7. Plaintiff's claim was admitted as a compensable claim by defendant pursuant to a Form 60 Employer's Admission of Employee's Right to Compensation filed with the Industrial Commission on or about 25 August 1995. Pursuant to the Form 60, defendant admitted that plaintiff sustained an admittedly compensable injury by accident to his left leg on 17 July 1995. Subsequently, the parties entered into binding form agreements regarding plaintiff's claim. On 13 March 1997, a Form 21 Agreement for Compensation for Disability was approved by the Commission for the payment temporary total disability compensation for a specified period of time. On that same day, the Commission approved a Form 26 Supplemental Agreement as to Payment of Compensation for the payment of a 100% permanent partial impairment rating to plaintiff's right fifth toe. In addition, the parties subsequently entered into a second Form 26 agreement whereby defendant agreed to pay a 45% permanent partial impairment rating to plaintiff's left foot. This form was approved by Deputy Commissioner Pfeiffer on 23 October 2000. Defendant denied plaintiff's claim for a change of condition pursuant to a Form 61 Denial of Workers' Compensation Claim filed with the Industrial Commission on 29 August 1997.
8. In addition to the deposition testimony and exhibits attached to the transcripts of each, the parties stipulated into evidence in this matter Stipulated Exhibits one through five. The Full Commission takes judicial notice of all Industrial Commission forms and orders in this matter.
 ***********
Based upon the greater weight of the competent and credible evidence of record in this matter, the Full Commission makes the following:
 FINDINGS OF FACT
1. On the date of the hearing before the Deputy Commissioner, plaintiff was 42 years old. Plaintiff has a high school diploma, and has taken several college courses at North Carolina State University. Plaintiff's prior employment history consists of mowing lawns, construction work, mechanic work, and plumbing.
2. Plaintiff began working for defendant in the early 1980s in the plumbing shop. Plaintiff also did steam work and worked on air conditioners and heaters.
3. Plaintiff was diagnosed with and was being treated for diabetes prior to 1995; however, there is no indication in the evidence of record to indicate that plaintiff experienced difficulty working as a result of his preexisting diabetic condition.
4. On 17 July 1995, plaintiff was injured at work when the shin of his left lower extremity was struck by a ladder. Plaintiff first sought medical treatment for the injury to his leg on 28 July 1995, when he was seen at Coastal Medical Center. Due to plaintiff's underlying, preexisting diabetes, the injury became much more serious than a similar injury would affect a person not suffering from diabetes.
5. Plaintiff came under the care of Dr. Alan H. Brader, a general surgeon, and was hospitalized for a period of time in August 1995, due to plaintiff developing an infection in the leg wound. Dr. Brader referred plaintiff to Dr. Joel David Krakauer, an orthopedic surgeon, who examined plaintiff on 22 September 1995. Dr. Krakauer diagnosed plaintiff with left Charcot foot, a condition where the bony architecture of the foot disintegrates following a fracture, resulting in "severe arthritis, multiple fractures and a disabling condition." Dr. Krakauer related plaintiff's condition to the left leg fracture and his diabetic condition. Plaintiff was prescribed a compression stocking and a brace, and he attempted to return to work in defendant's mail room which lasted for approximately one week.
6. Due to the problems he was experiencing with his left foot, including the fact that his left leg is now several inches shorter than his right leg, plaintiff increased the weight-bearing to his right foot and his gait was altered. Subsequently, plaintiff began to develop problems with his right foot as well as his left foot. On 14 November 1995, plaintiff returned to Dr. Brader with an infection on the lateral aspect of his right foot. Plaintiff was admitted to Wake Medical Center where the infection was treated with several operations, including the amputation of his fifth toe on the right foot and subsequent skin grafts.
7. Plaintiff's right foot problems are attributable not only to his underlying diabetes, but also were a direct result of his compensable left leg and foot injury, and therefore the problems with plaintiff's right foot are also compensable. Plaintiff's increasing right foot problems rendered him unable to continue working in defendant's mail room.
8. Dr. Krakauer released plaintiff to return to work with restrictions as of 23 February 1996. Dr. Krakauer opined that a sitting job would be preferable, but if that were not possible, it would be of benefit to him to use the prescribed foot orthotic. Shortly thereafter, however, plaintiff developed further complications that led to the need for a skin graft. By 9 July 1996, plaintiff's wounds had healed and Dr. Brader again released plaintiff from his care, expecting a full recovery of plaintiff's right foot with the exception of the amputated toe.
9. On 8 August 1996, Dr. Krakauer assigned a 45% permanent partial impairment rating to plaintiff's left foot. Dr. Krakauer did not continue to treat plaintiff thereafter; instead, plaintiff was treated primarily by Dr. Brader and Dr. Broadus S. Rose, a podiatrist.
10. Plaintiff had recurring foot problems after 1996, including the development in June 1997 of an ulcer on the right foot that resulted in a surgical debridement. On 8 January 1998, Dr. Rose released plaintiff to return to work at a sedentary job with "very little" walking and standing. On 15 May 1998, Dr. Rose approved as suitable for plaintiff's condition the job of boiler operator.
11. Upon his release to return to work and the approval of the job by Dr. Rose, plaintiff returned to work in this job as a boiler operator on 15 June 1998. Plaintiff was told when offered this job that it would accommodate his need to be off his feet more often and required less standing and walking than his prior job. Plaintiff was able to do this job for an extended period of time, albeit with having to take vacation and sick time on occasion due to his foot problems. However, his job switched to the old power plant and this switch required plaintiff to walk and stand more, including climbing more stairs than in the new plant. Plaintiff also had to drive to and from Centennial Campus and to the North Carolina state fairgrounds to take readings, which required him to have to walk to and from the truck and into the satellite locations. Plaintiff was able to sit while doing some of the required job duties, but most tasks had to be done while standing. Plaintiff also had to do some lifting of eighty-pound bags of salt and housekeeping work such as mopping floors and emptying trash cans.
12. The boiler operator job description approved by Dr. Rose was less detailed than the Office of State Personnel position description for a boiler operator II. The OSP job description was signed by plaintiff and his purported supervisor, Edward Norris, in April 1999 (although testimony later confirmed that plaintiff's supervisor was a different person altogether and that Mr. Norris never actually worked with plaintiff on the second shift, which is when plaintiff worked). The OSP job description, compiled by Mr. Norris, indicates that frequent standing and occasional walking were necessary in the job, and that sitting was rare. The Full Commission finds that the OSP job description was more accurate than that provided in the testimony of Mr. Norris; therefore, the job description provided by Mr. Norris, while not stricken from the record, is given less weight and credibility than the testimony of plaintiff regarding the physical requirements of the boiler operator position.
13. As the need for his standing and walking increased, plaintiff's problems increased, and he began to complain to his supervisor about the increased demands of working in the old plant and about the difficulties he was having with the walking and lifting that was required.
14. Plaintiff continued to have ongoing problems with his feet, and sought treatment from Dr. Lori B. Lilley, a general surgeon who practiced with Dr. Brader, and additional treatment from Dr. Rose, the podiatrist. Both physicians treated plaintiff for recurrent foot problems. On 13 May 2000, Dr. Lilley amputated a second toe on plaintiff's right foot due to diabetic foot infection on the distal aspect of the foot, next to plaintiff's previous amputation. Plaintiff last worked for defendant in May 2000, and began receiving disability retirement benefits in August 2000.
15. Dr. Krakauer's release of plaintiff to return to work in February 1996 was with restrictions, and preferably a sitting job. Although Dr. Krakauer did not continue to treat plaintiff after 1996, he evaluated plaintiff again on 5 July 2000. At this time, Dr. Krakauer felt that plaintiff had reached maximum medical improvement, and the physician agreed with the ratings of 45% to plaintiff's left foot and 50% to his right foot. Dr. Krakauer also indicated that plaintiff's capacity to work was limited, and that plaintiff could only work in a job that was "strictly sedentary with no standing required."
16. Dr. Lilley, who only treated plaintiff's right foot, felt that plaintiff was at maximum medical improvement by November 2000, although she felt that continued medical monitoring and follow-up was appropriate and probably necessary. Dr. Lilley also felt that as long as plaintiff did not have unhealed wounds on his feet, he should be able to return to work at "some sort of job." In June 2000, Dr. Lilley did not feel that plaintiff would be disabled for another year, and she indicated that vocational rehabilitation may be appropriate in this case (but she did note that plaintiff was "not interested in this right now.") Like Dr. Krakauer, Dr. Lilley is of the opinion that plaintiff's ability to attempt to return to work is contingent upon the job being a sedentary one with no standing requirement.
17. Dr. Rose, as a podiatrist, was plaintiff's primary treating physician and Dr. Lilley defers to the opinions of Dr. Rose regarding plaintiff's case and care. As of July 1999, Dr. Rose was of the opinion that plaintiff had not yet reached maximum medical improvement. Dr. Rose's opinion is supported by the fact that plaintiff had a second toe amputated on his right foot in May 2000. Dr. Rose is of the opinion that, if at all, plaintiff would only be able to perform a job that is completely sedentary in nature.
18. Plaintiff has not been able to perform the boiler operator job since May 2000. Since that time, plaintiff has not been offered any other job by defendant that would be appropriate for his physical limitations and restrictions, i.e., a job that is strictly sedentary in nature. Plaintiff has been totally disabled since May 2000.
19. Plaintiff has never held an office job during his employment history. However, based upon plaintiff's age and education, and the fact that the physicians have indicated that it may be possible for plaintiff to work at a sedentary job, the Full Commission cannot find as fact that plaintiff is permanently and totally disabled.
20. While plaintiff had a preexisting medical condition, namely, diabetes, this preexisting condition was non-disabling prior to his compensable injury by accident. Plaintiff's injury by accident on 17 July 1995, accelerated and aggravated plaintiff's underlying medical condition. Had plaintiff not sustained the initial injury by accident, he may not have developed the resulting serious medical problems with both feet until years later, if at all.
21. The Industrial Commission has previously found and held in an Opinion and Award that the loss of plaintiff's fifth toe on his right foot was causally related to his compensable left foot injury. While Dr. Brader wrote a letter in June 2000 attributing plaintiff's recurrent foot ulcers primarily to his underlying medical condition of diabetes as opposed to the previous injury, it is significant that Dr. Brader has not treated plaintiff since 1996 or 1997. Instead, since that time plaintiff has been treated primarily by Drs. Lilley and Rose. Both of these physicians, in testimony that is afforded more weight than the June 2000 evidence of Dr. Brader, have testified that plaintiff's right foot problems are related to his initial injury by accident together with his preexisting diabetes in that the initial injury triggered and/or accelerated the process. This testimony is accepted by the Full Commission as credible. Based upon his initial injury and the resulting compensable loss of his right fifth toe, in combination with his preexisting diabetes, plaintiff is at an increased risk of future problems with both feet. Therefore, plaintiff's right foot problems, including the recurrent ulcers and the amputation of his right fourth toe on 13 May 2000, are causally related to his injury by accident combined with his underlying preexisting condition.
22. Plaintiff's initial injury by accident aggravated and accelerated his underlying medical condition. Further, his performance from June 1998 through May 2000 of his job duties as a boiler operator, as described above, contributed to the development of plaintiff's recurrent problems, including the aggravation of the problems in his right foot.
23. The loss of plaintiff's right fourth toe on 13 May 2000, after having lost his right fifth toe as a compensable consequence of his initial compensable injury by accident, constitutes a change of condition within the meaning of the Act. Since that time, plaintiff's condition has increased in seriousness and in disability. Defendant has denied plaintiff's claim for a change of condition.
24. Plaintiff's successful trial return to work as a boiler operator II rebutted the presumption of ongoing disability. However, plaintiff's subsequent change of condition has again rendered him totally disabled.
25. Plaintiff has been rated with a 45% permanent partial impairment rating of his left foot and has been compensated therefor. Plaintiff has also retained a 50% permanent partial impairment rating of his right foot.
26. On 5 September 2000, the parties entered into a Form 26 Supplemental Agreement as to Payment of Compensation Pursuant to N.C. Gen. Stat. § 97-82 which was approved by the Commission on 23 October 2000. In the Agreement, defendant stipulated that plaintiff was entitled to 64.8 weeks of compensation at a rate of $314.95 per week for a 45% permanent partial disability rating to plaintiff's left foot.
27. Plaintiff's past medical treatment, including treatment for his right foot, has been reasonably necessary to effect a cure, give relief, or lessen the period of his disability. Plaintiff will be in need of ongoing medical treatment for the problems with his feet stemming from a combination of the injury by accident and his preexisting diabetes. Dr. Rose is the appropriate physician to manage plaintiff's general foot care and treatment.
28. Defendant paid to plaintiff short term disability compensation from 9 July 2000 through 10 July 2001, totaling $14,376.00. Defendant paid to plaintiff long term disability compensation from 11 July 2001 through 31 July 2001, for a total of $20,173.17.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident on 17 July 1995. N.C. Gen. Stat. § 97-2(6). This injury by accident materially aggravated and accelerated an underlying, preexisting medical condition, and resulted in compensable injuries to both of plaintiff's feet.
2. Plaintiff's recurrent right foot problems, including the amputation of his right fourth toe, are causally related and attributable not only to plaintiff's initial injury by accident and resulting foot problems, but also to his employment as a boiler operator II in conjunction with his preexisting diabetes. N.C. Gen. Stat. § 97-2(6).
3. As a result of his recurrent right foot problems that resulted in the amputation of a second toe, plaintiff's condition has increased in seriousness and has caused a substantial change in plaintiff's ability to earn wages, in addition to the loss of the toe. Plaintiff has suffered a change of condition within the meaning of the Act. N.C. Gen. Stat. § 97-47.
4. Plaintiff's change of condition has rendered him temporarily totally disabled since 13 May 2000, when he had his toe amputated. However, based upon his age, education, and physical condition, plaintiff is not at this juncture permanently totally disabled. N.C. Gen. Stat. § 97-29. Instead, plaintiff is capable of at least attempting employment that is strictly sedentary in nature. Therefore, plaintiff is entitled to temporary total disability compensation in the weekly amount of $314.95, beginning on the last day plaintiff worked in May 2000, and continuing until further Order of the Commission. N.C. Gen. Stat. §97-29.
5. Defendant is entitled to a credit for short and long term disability payments made to plaintiff during the time he is eligible for temporary total disability compensation. N.C. Gen. Stat. § 97-42. Said credit shall be limited to 75% of the short and long term disability payments qualifying for a credit. The remaining 25% of said credit shall be paid to plaintiff's counsel as part of the attorney's fees approved in this case. See Church v. Baxter Travenol Laboratories, Inc.,104 N.C. App. 411, 409 S.E.2d 715 (1991).
6. Plaintiff has retained a 45% permanent partial impairment rating to his left foot, for which he is eligible to receive weekly compensation of $314.95 beginning on 8 August 1996, and continuing for a total of 64.8 weeks. N.C. Gen. Stat. § 97-31(14).
7. Plaintiff's compensation for the 45% permanent partial disability rating to his left foot became due and payable on 23 October 2000, the date the Form 26 Supplemental Agreement as to Payment of Compensation Pursuant to N.C. Gen. Stat. § 97-82 was approved by the Commission. Defendant failed to comply with the Agreement within statutory deadlines. Accordingly, plaintiff is eligible for a 10% penalty on the amount due pursuant to N.C. Gen. Stat. § 97-18(g).
8. Plaintiff received a 50% permanent partial impairment rating to his right foot as a result of his compensable injury by accident and the material aggravation of his preexisting medical condition. Accordingly, plaintiff is eligible to receive weekly compensation of $314.95 for a total of 72 weeks, beginning on 5 July 2000, the date of the rating. N.C. Gen. Stat. § 97-31(14). However, because plaintiff is entitled to temporary total disability compensation beginning on 13 May 2000 and continuing which provides a more favorable remedy than that available pursuant to N.C. Gen. Stat. § 97-31(14), plaintiff is limited to the more favorable remedy. Dishmond v. International Paper Co.,132 N.C. App. 576, 512 S.E.2d 771 (1999).
9. Plaintiff is entitled to receive medical compensation for all related medical treatment that is reasonably necessary to effect a cure, give relief, or lessen the period of his disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
10. Based upon the complex questions of medical causation in this case, and due to plaintiff's underlying preexisting medical condition, defendant has not unreasonably denied this claim as plaintiff has claimed. Attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1 are therefore not warranted in this case.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to plaintiff the amount of $20,408.76 in compensation for the 45% permanent partial disability rating to plaintiff's left foot. In addition, defendant shall pay to plaintiff the amount of $2,040.88 in penalties for late payment of said compensation.
2. Subject to the attorney's fee approved below and credit for short and long term disability payments, defendant shall pay plaintiff temporary total disability compensation at the weekly rate of $314.95 from the date he last worked in May 2000 through the present and continuing until such time as plaintiff returns to work or until further Order of the Commission. Said compensation that has accrued shall be paid in a lump sum.
3. Defendant shall receive a credit for short and long term compensation benefits paid to plaintiff between the date he last worked in May 2000 through the present in the amount of 75% of the total amount qualifying for a credit. Said 75% of the credit amount shall be deducted from the lump sum compensation due to plaintiff in Paragraph 2. The remaining 25% shall be awarded to plaintiff's counsel as part of the attorney's fees in this case.
4. Plaintiff's counsel is entitled to a reasonable attorney's fee of 25% of the full amount of compensation awarded herein to plaintiff prior to the subtraction of the credit awarded to defendant. Defendant shall deduct one-fourth of the full amount of compensation awarded to plaintiff and shall forward this directly to plaintiff's counsel. Plaintiff's counsel shall thereafter be entitled to receive every fourth compensation check.
5. Defendant shall provide all reasonably related medical treatment that is necessary to effect a cure, give relief, or lessen the period of plaintiff's disability.
6. Defendant shall bear the costs of this proceeding.
This the ___ day of September, 2002.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN